UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| SAMICK MUSICAL INSTRUMENTS CO., LTD., a Korean limited company,<br><br>Plaintiff,<br><br>v.<br><br>QRS MUSIC TECHNOLOGIES, INC., a Delaware corporation; THOMAS DOLAN, an individual,<br><br>Defendants. | Case No. 2:15-cv-00333-MMD-GWF<br><br>ORDER<br><br>(Defendant/Counterclaimant's Motion for Partial Summary Judgment — ECF Nos. 57, 58) |
| QRS MUSIC TECHNOLOGIES, INC., a Delaware corporation,<br><br>Counterclaimant,<br><br>v.<br><br>SAMICK MUSICAL INSTRUMENTS CO., LTD., a Korean limited company,<br><br>Counterdefendant. | |

**I. SUMMARY**

This case centers on a contract dispute between two musical instrument and technology manufacturers. The parties disagree about the meaning and application of contract governing the production and sale of pianos. Plaintiff/counter-defendant SMK argues that it was in harmony with the terms of the agreement. Defendant/counterclaimant argues that manufacturer of the pianos here could not keep up with the tempo and must now face the music.

Before the Court is a Motion for Partial Summary Judgment ("Motion") filed by defendant/counterclaimant QRS Music Technologies, Inc. ("QRS"). (ECF Nos. 57, 58.)[1] The Court has reviewed the Motion as well as plaintiff/counterdefendant Samick Musical Instruments Co. Ltd.'s ("SMK") response (ECF No. 73) and QRS's reply (ECF No. 81). For the reasons discussed below, QRS's Motion is granted in part and denied in part.

## II. BACKGROUND

### A. The Parties

QRS is a Delaware corporation that got its start at the turn of the 20th century designing and manufacturing player pianos. SMK is a South Korean musical instrument manufacturer and, importantly in this case, a major producer of pianos. The two companies entered into an agreement in 2007 that led to a legal dispute, which in turn was eventually settled through a 2010 agreement ("Agreement" (ECF No. 58-3)) — the subject of the current litigation. The Agreement includes a promissory note, a guaranty, and a production schedule. (ECF Nos. 58-5, 58-6, and 58-7 respectively.)

### B. The Agreement

The Agreement requires QRS to make monthly payments of $40,000 on a promissory note in the principal amount of $1,000,000, subject to the conditions discussed below. (ECF No. 58-5.) The Agreement also requires SMK to maintain certain inventory levels, as defined in a spreadsheet attached to the Agreement as "Exhibit D." (ECF No. 58-7.) Specifically, the Agreement states:

> SMK agrees at all times during the term of this Agreement to maintain an inventory in its warehouse in Gallatin, TN Pianos of the type and in the quantity set out in Exhibit D (the "Required SMK Inventories."). Exhibit D shall specify a quantity of Pianos which shall not exceed the following during the following periods: (a) January 1, 2010 through June 30, 2010 – 250 units of the specified mix; and (b) July 1, 2010 through December 31, 2010 –320 units of the specified mix. The Parties shall on a quarterly basis discuss the requirements set out in Exhibit D and if QRS has not purchased at least 150 units during the most recent quarter and there is mutual written agreement, the Parties shall amend Exhibit D.

---

[1]QRS filed a sealed (ECF No. 58) and an unsealed (ECF No. 57) versions of its Motion.

2

(ECF No. 58-3 at 4 (referring to "Exhibit D" (ECF No. 58-7)).) The parties intended for the schedule in Exhibit D to be based on the parties' past manufacturing and purchasing history. (ECF No. 58-15 at 4, 8, 9.) QRS created Exhibit D and did not actually produce Exhibit D for SMK until after the Agreement was executed. (ECF No. 73-8 at 6.)

The Agreement defines two types of default in relation to the inventory levels set out in Exhibit D — "Required Inventory Default" and "Continuing Required Inventory Default":

> If (a) as of the first business day of any calendar month SMK fails to have in its Gallatin warehouse the number of units specified in Exhibit D as to 25% of SKUs specified in Exhibit D (with an allowed variance of plus or minus 20% of the required number of units of any particular SKU) or (b) on every day during any calendar month, SMK shall fail to have at least one of each SKU listed in Exhibit D, THEN it shall be deemed to be in "Required Inventory Default." If SMK is in Required Inventory Default for three succeeding calendar month, it shall be deemed to be in "Continuing Required Inventory Default." The remedies for such Required Inventory Default and Continuing Required Inventory Default are set forth in the Promissory Note and incorporated here by reference.

(*Id.*) The remedies contained in the Promissory Note are as follows:

> Notwithstanding any provision herein to the contrary, Maker [QRS] shall have no obligations to make any payment hereunder until Payee [SMK] has met for three succeeding months the Required SMK Inventories requirement as defined in the Agreement (as defined below). All obligations of Maker to make monthly payments shall be suspended during any period that Holder is in default pursuant to the terms of that certain agreement by and between Maker and Holder a copy of which is attached hereto as Exhibit A (the "Agreement"). Without limiting the generality of the preceding sentence, payments shall be suspended during any period that Holder is not in compliance with paragraph seven (7) of the Agreement. During any such period that payments are suspended, no late charge shall be imposed and no guarantor of this note shall have any obligation to make any payment to Holder. If SMK is in Continuing Required Inventory Default as that term is defined in the Agreement and which definition is incorporated by this reference, payments for the particular 3 month period are forgiven and forever discharged.

(ECF No. 58-5 at 3.)

The Agreement also states that QRS will provide technology called PNOScan units to SMK to be incorporated into pianos that QRS intended to purchase. (*Id.* at 4.)

///

///

3

### C. Performance

The parties never amended the Agreement or Exhibit D. (ECF No. 58-12 at 3; ECF No. 58-15 at 5.) SMK did not meet the inventory requirements in the Agreement during February, March, and April of 2010. (ECF No. 58-13 at 1.) SMK sought to amend Exhibit D, but QRS refused. (ECF No. 58-15 at 5.)

In what seems to be the central misunderstanding in this case, the two parties understood QRS's obligation to make monthly $40,000 payments differently. SMK believed that QRS was required to make monthly payments regardless of any other conditions. (ECF No. 58-12 at 2.) QRS believed it was only required to make payments if SMK complied with the inventory requirements in Exhibit D. (ECF No. 58-15 at 6.) Nonetheless, QRS made ten $40,000 payments (for a total of $400,000) over the course of 2010, which it claims were in response to SMK's demand for payment before it would ship any pianos. (*Id.*) QRS purchased a total of 436 pianos from SMK in 2010. (*Id.* at 10.)

QRS agreed to send SMK 2000 PNOScan units to SMK at a rate of $210 per unit. (ECF No. 58-19 at 3.) However, QRS ended up sending only 1792 units, 208 units short of the agreed upon amount. (*Id.*) QRS also sent SMK technology called PNOmation kits with adapters to be incorporated into pianos which it intended to purchase. (ECF No. 58 at 13.)

SMK filed suit in December 2014 asserting a number of contract and contract related claims. (ECF No. 3.) QRS asserted five counterclaims based on breach of contract and related legal theories. (ECF No. 23 at 23-27.) QRS now asks the Court to grant summary judgment, in one form or another, on SMK's first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, eleventh, and twelfth causes of action, reserving for trial only the determination of the value of 44 consignment pianos and QRS's counterclaims. QRS also seeks summary judgment on two of its counterclaims. (ECF No. 58 at 25-27.)

### III. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,

18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764,

783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

## IV. ANALYSIS

### A. Breach of Contract

Under Nevada law, to succeed on a breach of contract claim, a party must show (1) formation of a valid contract, (2) performance or excuse of performance by the plaintiff, (3) material breach by the defendant, and (4) damages. *Laguerre v. Nevada System of Higher Educ.*, 837 F.Supp.2d 1176, 1180 (D. Nev. 2011). The parties do not dispute the existence of a contract — the Agreement — but they offer competing accounts of who breached it.

#### 1. First Cause of Action

In its first cause of action, SMK alleges that QRS breached paragraph 3 of the Agreement by failing to provide SMK with a list and information about pianos in its possession within the requisite amount of time ("the List"). (ECF No. 3 ¶¶ 70-75.) QRS argues that this claim fails because the list was delivered only a day or two later and SMK cannot show that its tardy delivery caused any damages. (ECF No. 58 at 21.) SMK, however, responds that the damages stem from the fact that the List was, and remains, incomplete. (ECF No. 73 at 9.) According to SMK, it cannot adequately monitor and protect the consignment pianos (of which it remains the owner) without a complete record of pianos distributed to third party dealers. (*Id.*) In fact, the parties seem to at least partially agree that SMK may be able to prove damages related to a limited number of consignment pianos. (*See* ECF No. 81 at 12 ("SMK's claims regarding consignment issues, paperwork or payments, is limited to the value of 44 consignment pianos that QRS did not pay to SMK.").)

Therefore, QRS's Motion is granted in part. SMK has failed to show a dispute of material fact for its first cause of action as it related to the delay in delivery of the List. However, SMK has identified, and QRS at least partially concedes, a material dispute

6

about damages stemming from the incompleteness of the list. The Motion is denied as it relates to those damages, and the claim will move forward on that limited theory.

### 2. Second & Third Causes of Action

In its second cause of action, SMK alleges QRS violated paragraph 4 of the Agreement by failing to provide a complete list of dealers who held pianos on consignment or owed funds to QRS based on pervious consigned piano sales and failing to obtain SMK's consent for any new consignment piano dealers. (ECF No. 3 ¶¶ 76-82.) SMK's third cause of action alleges QRS violated paragraph 8 of the Agreement by failing to provide orders prior to making purchases from SMK and paying for consignment pianos 30 days following a specified end-of-month reconciliation. (*Id.* ¶¶ 83-91.)

QRS asks the Court to limit any damages on these claims to the value of the 44 consignment pianos at issue. (ECF No. 58 at 19.) SMK does not specifically oppose this limiting request, and agrees that the number of pianos unaccounted for is 44. (ECF No. 73 at 9-10.) Therefore, QRS's Motion is granted with respect to SMK's second and third causes of actions. Any damages stemming from these two causes of action are limited to the value of the 44 consignment pianos at issue.

### 3. Fourth Cause of Action

SMK's fourth cause of action alleges that QRS failed to pay shipping costs in violation of the Agreement. (ECF No. 3 ¶¶ 92-96.) The Agreement provides:

> QRS shall at the time of pick-up or delivery of [pianos purchased for its own inventory], pay for such Pianos by cashier's or certified check. The Price paid by QRS to SMK for Pianos shall include a charge for the actual cost of shipping from the manufacturing facility to the SMK warehouse in Gallatin, TN.

(ECF No. 58-3 at 4.) QRS argues the only pianos SMK has identified as the basis for this claim are pianos which SMK is storing in its warehouse, and QRS would only be required to pay shipping fees if it actually purchased a piano. (ECF No. 58 at 20.) SMK responds that the pianos in its warehouse were manufactured specifically for QRS and cannot be sold to other buyers, and therefore QRS should be responsible the shipping costs related to moving the pianos from Indonesia, where they are manufactured, to Tennessee. (ECF

No. 73 at 10-11.) SMK's argument is a compelling reason to include language making QRS responsible for all shipping costs of pianos manufactured for it during contract negotiations. However, the Agreement, as written, contains no such requirement. Nor does it contain any language requiring QRS to pay storage fees.

QRS is correct that the clear language of the Agreement only requires it to pay shipping costs for pianos it purchases, rather than pianos SMK manufactures for QRS and ships to its warehouse. QRS has shown that there are no disputes of material fact in regards to SMK's fourth cause of action. Accordingly, the Court grants summary judgment in favor of QRS on the fourth claim.

### 4. Fifth Cause of Action

The fifth cause of action alleges the Agreement imposed a duty to generate sales and consignments of pianos upon QRS, and QRS abandoned that duty. (ECF No. 3 ¶¶ 97-103.) Though the Agreement does not explicitly impose such a duty on QRS, SMK argues that QRS's behavior supports recovery under a contract-abandonment theory. (ECF No. 73 at 11.) Contract abandonment is a doctrine that allows one party to recover for work which was not contemplated by the express terms of a contract. *See J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1019 (Nev. 2004). Typically, all parties to a contract must consent to the departure from the contract for the theory to apply. *Id. See also* 17A Am. Jur. 2d Contracts § 517.

SMK's theory simply does not apply to the facts at hand. First, SMK is attempting to use a quasi-contract theory to support a breach of contract claim, which is legally incoherent. Even if it could somehow show it was entitled to an award based on contract abandonment, SMK has not set out an intelligible argument why. SMK's response tosses out contractual terms like abandonment, cardinal change, and reasonable expectations, and refers to the argument set out in its sixth cause of action, but never lays out a case for why QRS actually breached the Agreement. For these reasons, QRS has shown that there is no material dispute of fact, and indeed no plausible legal theory, behind SMK's fifth cause of action. QRS's Motion is granted on this claim.

### 5. Sixth Cause of Action

SMK's sixth cause of action alleges that QRS failed to make required payments under the promissory note and owes SMK the remaining $600,000 balance. (ECF No. 3 ¶¶ 104-07.) QRS argues that it was not obligated to make payments so long as SMK failed to meet the inventory requirements set out in Exhibit D. (ECF No. 58 at 14-15.) In fact, QRS maintains that it *over-payed* $400,000 under the Agreement. (*Id.*) Confusingly, SMK argues in its response that it complied with the required inventory set out in Exhibit D, yet SMK admitted in its 30(b)(6) deposition that it did not meet Exhibit D's inventory requirements for February, March, or April of 2010. (ECF No. 58-13 at 1.) Just as confusingly, QRS does not claim that among its undisputed material facts that SMK was in default for any months other than February, March, or April, yet it seeks to avoid any liability under the note and eventually recover the $400,000 it already paid.

SMK also argues that it was impossible to comply with the Exhibit D schedule because 1) QRS set the requirements knowing that SMK would not be able to meet at least the January 2010 number, 2) SMK required components from QRS in order to produce some of the pianos, and QRS did not provide those components until March 2010, and 3) QRS ignored industry standard manufacturing lead times and reasonable business practices. (ECF No. 73 at 6-7.) The first and third of these arguments may support SMK's claim for a breach of the covenant of good faith and fair dealing, but they do not alter the clear terms of the Agreement or inventory levels in Exhibit D, so they are not helpful in defending against a breach of contract claim based on those factors.

Nonetheless, QRS has failed a show a lack of material disputes of fact underlying this claim. There are, in fact, several clear disputes of fact and material facts that are not clearly established from the record. For example, it is unclear whether SMK was in compliance with Exhibit D after April 2010, and if so, for which months. It is also unclear whether QRS ever purchased less than 150 pianos in a given quarter, and if so, how that fact would affect the parties' responsibility to amend Exhibit D as set out in paragraph 7

///

of the Agreement.[2] Finally, QRS did not respond to SMK's argument that it was unable to produce certain pianos in order to meet the inventory requirements because QRS failed to provide the exclusive parts required until March 2010. (ECF No. 72 at 7 (citing ECF No. 73-8 at 9-10).) These material disputes make summary judgment inappropriate on SMK's sixth cause of action for breach of the Agreement. For these reasons, QRS's Motion is denied on this count.

### 6. Seventh & Eighth Causes of Action

SMK alleges that QRS additionally breached the Agreement by failing to deliver 208 pieces of piano technology called PNOScan units totaling $43,680. (ECF No. 3 ¶¶ 108-13.) SMK also alleges that QRS's failure breached a separate oral agreement. (*Id.* ¶¶114-18.) QRS seeks summary judgment on SMK's eighth cause of action because the agreement was based on a written email exchange, rather than an oral agreement. QRS also seeks to limit the total damages available to $43,680 and make clear that they are subject to offset. (ECF No. 58 at 22.)

SMK does not specifically address QRS's argument about the eighth cause of action based on an oral agreement. However, SMK does dispute that the damages for these claims should be limited to $43,680 because the PNOScan products are now outdated and SMK may not be able to make the same profit off of them as it would have in 2010. (ECF No. 73 at 14.) As QRS rightly points out, SMK relies on a declaration from Andrew Ryu, Vice President of SMK's wholly owned American subsidiary. The declaration contradicts Ryu's deposition testimony, wherein he testified that the only damages associated with the PNOScan units was $43,680. A party cannot create a dispute of fact through an affidavit contradicting prior testimony. *See Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009).

///

---

[2]The Agreement states that "[t]he Parties shall on a quarterly basis discuss the requirements set out in Exhibit D and if QRS has not purchased at least 150 units during the most recent quarter and there is mutual written agreement, the Parties shall amend Exhibit D." (ECF No. 58-3 at 4.)

QRS's Motion is granted with respect to SMK's seventh and eighth causes of action.

### B. Breach of the Covenant of Good Faith and Fair Dealing (Ninth Cause of Action)

Under Nevada law, "all contracts impose upon the parties an implied covenant of good faith and fair dealing, which prohibits arbitrary or unfair acts by one party that work to the disadvantage of the other." *Nelson v. Heer*, 163 P.3d 420, 427 (Nev. 2007) (citations omitted). The question of whether a party has acted in good faith is a question of fact. *Mitchell v. Bailey and Selover, Inc.*, 605 P.2d 1138, 1139 (Nev.1980)

SMK alleges QRS breached the implied covenant in a number of ways, including generally entering into the Agreement with no intention to honor its terms and knowingly setting out impossible inventory requirements in Exhibit D. (ECF No. 3 ¶¶ 119-22.) SMK offers a number of plausible theories for this claim, most notably that QRS knowingly created unworkable inventory requirements and refused to negotiate in good faith when SMK could not meet those requirements. SMK has also produced evidence upon which a fact finder could reasonably conclude that QRS acted in bad faith. (ECF No. 73-7 at 15; ECF No. 73-8 at 7-8.)

QRS has failed to show an absence of material issues of fact underlying SMK's ninth cause of action for breach of the covenant of good faith and fair dealing, and therefore its Motion is denied with respect to this claim.

### C. Promissory Estoppel & Unjust Enrichment (Eleventh and Twelfth Cause of Action)

QRS is correct that SMK's claims are governed by an express contract, and therefore its unjust enrichment claim is inapplicable. "An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement." *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 942 P.2d 182, 187 (Nev. 1997) (citing 66 Am.Jur.2d *Restitution* § 6 (1973)).

Similarly, SMK's promissory estoppel claim is improper because it is based on the allegation that QRS failed to comply with the Agreement. SMK's eleventh claim for relief is simply a restatement of its breach of contract and breach of the implied covenant of good faith and fair dealing claims. "The doctrine of promissory estoppel, which embraces the concept of detrimental reliance, is intended as a substitute for consideration, and not as a substitute for an agreement between the parties." *Vancheri v. GNLV Corp.*, 777 P.2d 366, 421 (Nev. 1989) (approvingly citing California law). *See also JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 880 F.Supp 2d 1029, 1036 (N.D. Cal. 2012) (promissory estoppel is extra-contractual and applies only in the absence of an enforceable contract).

For these reasons, QRS's Motion is granted with respect to SMK's eleventh and twelve causes of action for unjust enrichment and promissory estoppel.

### D. QRS's Counterclaims

QRS alleges that it sent SMK a number of pieces of technology — including devices called PNOScan and PBOmation units — which were meant to be incorporated into pianos and sold back to QRS. (ECF No. 23 at 23.) QRS further alleges that SMK has neither used nor paid for many of these units. (*Id.*) QRS seeks summary judgment on two of its counterclaims as they relate to the 2010 delivery of 128 PNOmation kits with adapters worth $209,942.96. (ECF No. 58 at 24.) QRS argues that it is undisputed that it delivered the units and they were never paid for or incorporated into pianos for QRS, and therefore it is entitled to $209, 942.96 under either an unjust enrichment or conversion theory. (Id. at 25.)

To recover under a theory of unjust enrichment a party must show that it conferred "a benefit on the defendant, the defendant appreciates such benefit, and there is 'acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.'" *Certified Fire Propt. Inc. v. Precision Constr. Inc.*, 283 P.3d 250, 257 (Nev. 2012) (citation omitted). To recover under a conversion theory, a party must show that a defendant "wrongfully exerted [dominion] over personal property in denial of, or

inconsistent with, title or rights therein or in derogation, exclusion or defiance of such rights." *Winchell v. Schiff*, 193 P.3d 946, 950 (Nev. 2008) (citation omitted).

SMK responds that the units are useless to them because they are both incomplete and only good for QRS specific pianos. (ECF No. 73 at 17-18.) SMK also disputes the number of units at issue and their value, and further contends that they cannot exert wrongful dominion over the units when they were voluntarily sent by QRS, who in turn failed to purchase any pianos in which they would be used. (*Id.*) These arguments go to essential elements of each claim — namely whether the units constitute a benefit and whether they are being wrongly held.

SMK has demonstrated that QRS's counterclaims involve material disputes of fact and are therefore not suited for summary judgment. QRS's Motion is denied with respect to these claims.

### E. Attorney Fees

The Agreement allows the party "in whose favor final judgment" is issued to collect attorney fees from the losing party. (ECF No. 58-3 at 6.) Both parties argue that they are entitled to fees for their work on QRS's Motion. (ECF No. 58 at 25; ECF No. 73 at 18.) At this stage of the litigation, while each party still has viable claims, the Court finds the most prudent course of action is to defer ruling on either parties' entitlement to fees. Therefore, QRS's Motion is denied without prejudice.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion because they do not affect the outcome of the Motion.

It is therefore ordered that QRS's Motion is granted in part and denied in part. It is granted in part in the following manner:

1. SMK's first cause of action is limited to damages caused by the incompleteness of the List discussed in paragraph 3 of the Agreement;

2. The damages in SMK's second and third causes of action are limited to the value of the 44 pianos discussed above;
3. Damages for SMK's seventh cause of action are limited to $43,680; and
4. Summary judgment is granted in favor of QRS on SMK's fourth, fifth, eighth, eleventh and twelfth causes of action.

QRS's Motion is denied in all other respects.

DATED THIS 17th day of August 2017.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE